**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George Franklin CARTER,
Defendant-Appellant.**

**No. 78–1666.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 4, 1979.

Decided Feb. 15, 1979.

Certiorari Denied April 16, 1979.
See 99 S.Ct. 2001.

---

Oliver M. Spurlock, Chicago, Ill., for defendant-appellant.

Ludwig E. Kolman, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, SPRECHER and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal raises the question of whether a Drug Enforcement Administration agent may participate with customs inspectors in conducting a border search. We hold that there is neither constitutional nor statutory infirmity in such participation under the circumstances of this case.

I

The defendant arrived at the international terminal at O'Hare Airport in Chicago on February 8, 1978, terminating a nonstop flight from Amsterdam, Netherlands. He passed through immigration, retrieved his luggage, consisting of a brown vinyl suitcase, a blue garment bag, and a yellow duty-free bag, and proceeded to the customs inspection area. He handed his customs declaration form, airline ticket and passport to Customs Inspector Gooding, who asked routine questions and inspected the brown suitcase.

The defendant was then taken to a secondary search room by Gooding, where they were immediately joined by Drug Enforcement Administration agent Whittington. Gooding asked the defendant to empty his pockets onto a table in the search room, which resulted in the defendant's removal of a large quantity of United States currency. Gooding then requested the defendant to remove his overcoat which Gooding examined and in which he found another large quantity of currency. Gooding then requested the defendant to remove his suitcoat which Gooding examined and in which he found a folded tinfoil packet holding a white, powdery substance later determined to contain heroin.

At this point, Gooding's supervisor, Customs Inspector Knezev appeared in the secondary search room, and Knezev obtained a small plastic bag into which the tinfoil packet was placed. Knezev also ordered Gooding to conduct a strip search of the defendant. Gooding, with Whittington still present, conducted the strip search.

As the defendant dressed, Gooding left the search room to obtain a form necessary when more than $5,000 in currency is brought into the country. While Gooding was absent, Whittington counted the money. When he returned the defendant filled out the currency form. Gooding then left the defendant with Whittington while he carried the brown suitcase and the blue garment bag into another search room and inspected them. At that time, Knezev returned with Customs Inspector Gross, who joined Whittington and the defendant.

The yellow duty-free bag had remained in the hallway outside the secondary search room, where Gross and Whittington examined it and found it to contain a bottle of vodka and four cartons of cigarettes. Gross cut the tape which sealed the bag shut and removed a carton. Whittington removed a second carton and asked the defendant,

"What is in here, besides cigarettes?" The defendant appeared to become somewhat nervous and responded, "Nothing, go ahead, open them, if you want to." The cartons were returned to the yellow bag.

Gooding returned and picked up the yellow bag which he proceeded to inspect. Upon removing one of the cigarette cartons, he noted that it felt heavy and resisted pressure when squeezed. He opened the carton and removed one of the individual packs while also resisted pressure when squeezed and shook when rattled. He opened the pack and found a plastic bag containing a white powdery substance. A second pack produced the same result.

Whittington, who had been present, then instructed his DEA partner to test the substance. The test revealed that the substance contained an opiate. It developed that 36 of the 40 cigarette packs contained a total of 930.40 grams of heroin, 786.16 grams of which were 85% pure and 144.24 grams of which were 84% pure. The tinfoil packet contained .02 grams of heroin.

Whittington arrested the defendant and Gooding turned over to Whittington the duty-free bag and its contents, as well as the tinfoil packet. Gooding took custody of the $6,969 in currency.

The defendant was charged in a two-count indictment with intentional importation and possession with intent to distribute heroin in violation of 21 U.S.C. §§ 952(a) and 841(a)(1). He was found guilty of both counts by a jury and was sentenced to 12 years' imprisonment on each count, to run concurrently, to be followed by a three-year mandatory special parole term. The defendant was also fined $15,000.

1. The Court in *Almeida-Sanchez* stated that, for example, "a search of the passengers and cargo of an airline arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search." 413 U.S. at 273, 93 S.Ct. at 2539.

2. The statute authorizing border searches expressly provides that any customs officer "may

## II

The defendant argued on appeal that the search was unconstitutionally conducted because of the participation by the DEA agent with the customs inspectors. In his presentation the defendant has not given full consideration to the unique nature of a border search.

A search of a passenger and his luggage upon arriving by airplane at O'Hare Airport after a nonstop flight from Amsterdam is the functional equivalent of a border search. *United States v. Brown*, 499 F.2d 829 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974). Searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into the country, are reasonable simply by virtue of the fact that they occur at the border. *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). Routine inspections and searches of individuals or conveyances seeking to cross the borders or their functional equivalents are not subject to the warrant provisions of the Fourth Amendment. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 37 L.Ed.2d 331 (1973).[1] *See also United States v. Odland*, 502 F.2d 148, 150–51 (7th Cir.), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 679, 42 L.Ed.2d 680 (1974).

Customs officers characteristically and properly inspect luggage. "[I]t is an old practice and is intimately associated with excluding illegal articles from the country." *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971).[2] Also, those entering the country may be examined as to their "belongings and effects"

. . . search any trunk or envelope . . in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law . . . ." 19 U.S.C. § 482. The statute authorizing the Secretary of Treasury to prescribe regulations for border searches speaks of searching "persons and baggage." 19 U.S.C. § 1582.

without violating the Fourth Amendment. *California Bankers Association v. Schultz,* 416 U.S. 21, 62–63, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). Belongings and effects have been held to include the contents of a person's purse, wallet or pockets. *Henderson v. United States,* 390 F.2d 805, 808 (9th Cir. 1967). *See also United States v. Flores,* 477 F.2d 608, 609 (1st Cir.), *cert. denied,* 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973); *United States v. Summerfield,* 421 F.2d 684, 685 (9th Cir. 1970).

■ The discovery of incriminating matter during routine searches is "reasonable cause to suspect" that a more intensive search will produce more contraband. Customs agents customarily proceed from the less intrusive to the more intrusive form of search. *United States v. Afanador,* 567 F.2d 1325, 1329 n.4 (5th Cir. 1978); *United States v. Asbury,* 586 F.2d 973, 976 (2d Cir. 1978).

The defendant's argument is centered on the fact that a DEA agent was involved with the customs inspectors in conducting the search of the luggage, belongings and effects of the defendant.

Customs officials under the supervision of the Secretary of Treasury and drug enforcement officials under the supervision of the United States Attorney General have traditionally cooperated and exercised some joint powers over drugs searched for and seized in border searches.[3] The present relationship between these kinds of federal officers is detailed in Reorganization Plan No. 2 of 1973,[4] which provides that all intelligence, investigative and law enforcement functions vested in the Secretary of Treasury which relate to the suppression of illicit traffic in drugs are transferred to the Attorney General

except that the Secretary shall retain, and continue to perform, those functions, to the extent that they relate to searches and seizures of illicit narcotics, dangerous drugs, or marihuana or to the apprehension or detention of persons in connection therewith, at regular inspection locations at ports of entry or anywhere along the land or water borders of the United States: *Provided,* that any illicit narcotics, dangerous drugs, marihuana, or related evidence seized, and any person apprehended or detained by the Secretary or any officer of the Department of the Treasury, pursuant to the authority retained in them by virtue of this section, shall be turned over forthwith to the jurisdiction of the Attorney General . . . and *Provided further,* that nothing in this section shall be construed as limiting in any way any authority the Attorney General, the Department of Justice, or any other officer or any agency of that Department may otherwise have to make investigations or engage in law enforcement activities, including activities relating to the suppression of illicit traffic in narcotics, dangerous drugs, and marihuana, at ports of entry or along the land and water borders of the United States.

Section 1, Reorganization Plan No. 2, 28 U.S.C. § 509 annotation.

■ The Reorganization Plan contemplates the very kind of cooperation and joint effort engaged in by the officers in this case. The DEA agent was primarily an onlooker until the tinfoil packet of heroin

---

3. In *United States v. Ortega,* 471 F.2d 1350 (2d Cir. 1972), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973), the court said "[w]e may remark, parenthetically, that a combination of customs agents and agents of the Bureau of Narcotics and Dangerous Drugs made an examination of the Jaguar and its contents in the hold of the Elizabeth II as she came up the harbor and one of the 180 bags of heroin was removed for testing." *Id.* at 1353–54. The court concluded that "[t]he search by a Customs Agent and others helping him, in the hold of the Elizabeth II while still in midstream, was clearly proper as a border search." *Id.* at 1360.

See also *United States v. Thompson,* 475 F.2d 1359 (5th Cir. 1973) (respective powers of customs agents and border patrol officers who are employees of the Immigration and Naturalization Service under the supervision of the United States Attorney General).

4. Effective July 1, 1973, 38 F.R. 15932, 87 Stat. 1091, as amended March 16, 1974, Pub.L. 93–253, § 1, 88 Stat. 50, 28 U.S.C. § 509 annotation, promulgated pursuant to 5 U.S.C. §§ 902–12.

was found in the defendant's pocket, whereupon his participation became somewhat more active. After the sizeable quantity of drugs was discovered, he made the arrest and the evidence was "turned over forthwith" to him by the customs inspector. The search was proper in every way.

The defendant sought to rely upon *Byars v. United States,* 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927), holding that when a federal officer participates officially with state officers in a search, the constitutionality of that search is to be tested as though it were an official federal search and not merely as a state or private search, the fruits of which would be fully usable by federal officers. The issue posed by *Byars* is not present here; the search here was an acknowledged federal search governed by border search standards. Defendant's reliance upon *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), is also misplaced since *Chadwick* does not deal with a border search.

### III

We find no merit in the defendant's second argument that the evidence was insufficient to show knowing possession of heroin.

The judgment of conviction is affirmed.